The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Joan JOHNSON, Defendant-Appellant.

No. 78–093.

Colorado Court of Appeals,
Division II.

March 20, 1980.

Rehearing Denied April 10, 1980.

Certiorari Denied June 30, 1980.

J. D. MacFarlane, Atty. Gen., David Purdy, Deputy Dist. Atty., designated counsel, Denver, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, Cynthia C. Cederberg, Deputy State Public Defender, Denver, for defendant-appellant.

RULAND, Judge.

Defendant, Joan Johnson, appeals her conviction by a jury of criminal solicitation to commit first degree murder. We affirm.

The prosecution's evidence indicated the following series of events occurred. On May 21, 1976, while traveling through Kansas, the defendant met Sgt. Richard Jollie, a military policeman, while conversing over a "CB" radio. The two carried on a conversation with several other motorists as they traveled towards Colorado, and eventually stopped for lunch together. Later, as the group neared Denver, Jollie and another member of the group, an air policeman, accepted the defendant's invitation to come to her home for dinner.

That evening the two guests discussed their police work with the defendant, including the use of various types of weapons. They also examined a gun belonging to the defendant. The defendant explained that she was then involved in divorce proceedings, and that she purchased the gun for protection against her husband who had recently broken into her home and assaulted her.

Jollie next heard from the defendant on June 16, 1976, when she telephoned him and told him that she continued to have problems with her husband and that she had $1,800 to pay someone to "take care" of those problems. Jollie told her not to do anything immediately, and set up an appointment to meet her at her home two days later. During that meeting, defendant told Jollie that she had considered all other alternatives and the possible ramifications of her actions, but that she was still serious about having someone kill her husband.

Jollie then arranged for the defendant to meet with Detective Ronald Butler of the Colorado Springs police department, who posed as a "hit man." During this meeting defendant told Butler of her troubles with her husband; that she wanted him killed; and asked if $1,800 would be enough money to have it done. Butler then, acting as "a middle man," agreed to set up another meeting with a second man.

On June 29, defendant met with Butler again, and was introduced to a second undercover agent, Detective Patrick Maes, posing as the actual "hit man." Butler then left. After visiting in the restaurant, Maes invited defendant to accompany him to his car, which was equipped with a concealed recording device.

Once in the car, defendant provided Maes with certain information about her husband's girlfriend and a description and license plate number of her husband's vehicle. The parties discussed some methods for the killing as well as a time frame, and the need for defendant to have an alibi. Defendant also assured Maes that she was serious about the deal and that she realized that the act would be a "final one." The defendant then handed Maes $1,800 in a white envelope, and was then arrested.

Defendant first contends that the trial court erred in admitting into evidence a tape recording of the conversation between defendant and Detective Maes. We disagree.

The meeting lasted 50 minutes (approximately 25 minutes in the restaurant and another 25 minutes in the car). Conversation in the restaurant was limited to small talk, and the detective advised the defendant that the business between the parties would have to be discussed in his automobile.

Our review of the tape recording reveals that the playing length is approximately 47 minutes. Of this total time, the first 25 minutes is completely blank, corresponding with the time defendant and the officer were inside the restaurant. Then, 14 minutes of generally clear, audible conversation is recorded, followed by an unexplained 4

minutes and 45–second gap. The sound then resumes with approximately 3 more minutes of clear recording, and then ends approximately 3 minutes before defendant was arrested. Of the 17 minutes of recorded conversation, approximately 2 additional minutes are distorted by traffic noises, the automobile's electric window, or by low voice response.

The defendant in effect challenges admission of the tape on two grounds, asserting that: (1) The gaps and inaudible portions of the tape render it unreliable because the jury was allowed to speculate that those parts of the tape contained evidence adverse to defendant; and, (2) statements made by the defendant which she views as exculpatory in nature were not recorded and thus she asserts that the tape presents an inaccurate record of the conversation.

■■ As to the first contention and insofar as pertinent here, the admissibility of the tape recording depends on its audible quality. *Alonzi v. People*, Colo., 597 P.2d 560 (1979). However, the mere presence of inaudible segments does not render the tape unreliable unless the inaudible portions are so substantial as to render the recording as a whole untrustworthy. *Alonzi v. People, supra; People v. Quintana*, 189 Colo. 330, 540 P.2d 1097 (1975). *See also* Annot., A.L.R.3d 746 (1974). And, the trial court must exercise its discretion in determining whether the tape should be admitted where parts of the tape are inaudible. *People v. Odneal*, 192 Colo. 382, 559 P.2d 230 (1977).

■ Here, although the tape does contain an unexplained gap and certain inaudible portions, approximately 15 minutes of the recorded portion was of good quality. There was no need for the jury to speculate because this portion of the tape contained ample evidence of defendant's guilt. Hence, we conclude that the trial court did not abuse its discretion in ruling that the tape was sufficiently reliable to be admitted into evidence. *People v. Quintana, supra.*

Relative to the second challenge, the record reflects that the defenses asserted by the defendant consisted of allegations that she lacked the requisite specific intent and that she suffered from a diminished mental capacity. Defendant testified that she made certain statements to Detective Maes which were not recorded on the tape and which she views as supporting both defenses. These statements were to the effect that she had viewed a recent movie about a woman in France who had been guillotined, and she asked Maes whether he was going to guillotine her; she described a dream in which she was arrested; and, she exclaimed to Maes at the conclusion of their meeting that, "You are the police, aren't you going to arrest me?" The People offered no evidence to rebut this testimony by the defendant.

■ We recognize the importance to the defendant of having her testimony corroborated. *See People v. Green*, 38 Colo. App. 165, 553 P.2d 839 (1976). However, relevant testimony from a witness who overhears part but not all of a conversation is admissible. *People v. Adamson*, 27 Cal.2d 478, 165 P.2d 3 (1946). And, the same analysis is applicable to a tape, *see, e. g., People v. Cash*, 28 Mich.App. 1, 184 N.W.2d 216 (1970), unless the party who recorded a conversation has attempted in some manner to delete parts as, for example, by erasing part of the recording, or selecting only parts of the conversation to record. No such contention was made in this case. Indeed, the concluding part of the conversation was not recorded simply because the tape ran out. Hence, we find no abuse of discretion by the trial court.

Relying upon § 16–8–109, C.R.S. 1973 (1978 Repl. Vol. 8), defendant next contends that the trial court erred in excluding qualified lay witness testimony concerning defendant's mental condition and mental capacity. During direct examination of three witnesses, objections were sustained to defense counsel's inquiry as to opinions regarding defendant's "reasoning ability" and her ability to form a specific intent during June of 1974.

■ Even assuming, *arguendo*, that the statute permits introduction of such testimony from lay witnesses, we perceive no

reversible error. The record reveals that the first witness answered defense counsel's question as to defendant's "reasoning ability" despite the fact that the trial court had earlier sustained the People's objection to the question. The second witness, although not allowed to testify as to defendant's ability to form a specific intent, did state that the defendant seemed tense, distraught, concerned, and worried, and that defendant's judgment "was not as good as I would like to have had it." The third witness also testified that defendant was "terribly depressive, terribly uncomprehensible, . . . [and] she wouldn't make a decision if she tried." As a result of the foregoing, the jury was apprised of the views of the witnesses on these issues.

Defendant next contends that the trial court erred in denying her motion for a new trial based on the newly discovered evidence that she was suffering from hypoglycemia. We find no merit in this contention.

Substantial evidence was provided the jury as to defendant's mental condition and capabilities. The additional evidence of defendant's hypoglycemic condition provided only a possible medical explanation as to why physical conditions had occurred. However, it is not probable that this evidence would have resulted in an acquittal. The trial court was correct, therefore, in denying the motion for new trial. *See Digiallonardo v. People*, 175 Colo. 560, 488 P.2d 1109 (1971).

We have considered defendant's other contentions of error and find them to lack merit.

Judgment affirmed.

ENOCH, C. J., and STERNBERG, J., concur.

